# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 11, 2010 Session

## IN RE:  SIDNEY J.

**Appeal by Permission from the Court of Appeals, Western Section**
**Chancery Court for Madison County**
**No. 64437, 64429      James F. Butler, Chancellor**

---

**No. W2008-01354-SC-R11-PT - Filed May 10, 2010**

---

We granted appeal to determine whether a trial court may grant an intervening adoption petition pursuant to Tennessee Code Annotated section 36-1-116(f)(1) when the intervening petitioners did not have physical custody or the right to receive physical custody of the child sought to be adopted at the time they filed their petition.  The maternal grandparents petitioned to adopt the child, who was in their physical custody, and the paternal grandparents filed an intervening adoption petition.  After engaging in a comparative fitness analysis, the trial court granted the paternal grandparents' petition.  The Court of Appeals held that the trial court erred in considering the paternal grandparents' petition because they did not meet the physical custody requirement in section 36-1-116(f)(1) and remanded the case to the trial court to enter an order granting the maternal grandparents' petition.  We hold that section 36-1-116(f)(1) includes an exception to the physical custody requirement when the petitioners have filed an intervening adoption petition and the child sought to be adopted is in the physical custody of the original petitioners.  We also hold that the evidence does not preponderate against the trial court's findings that the paternal grandparents were fit, that they were financially capable of providing for the child, and that the child's best interests would be served by granting their petition.  We therefore reverse the judgment of the Court of Appeals and reinstate the judgment of the trial court in all respects.

**Tenn. R. App. P. 11 Appeal by Permission;**
**Judgment of the Court of Appeals Reversed**

JANICE M. HOLDER, C.J., delivered the opinion of the Court, in which CORNELIA A. CLARK, GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

David W. Camp and Randy C. Camp, Jackson, Tennessee, for the appellants, Donald J. and Wanda J.

Jeff Mueller, Jackson, Tennessee, for the appellees, Donald R. and Lois R.

**OPINION**

**I. Facts and Procedural History**

Sidney J. was born on November 29, 2000. On January 11, 2005, Sidney's father shot and killed her mother and two other individuals. Immediately thereafter, Sidney's maternal grandparents undertook her care and petitioned the Madison County Juvenile Court for temporary custody. On January 18, 2005, the juvenile court found Sidney to be dependent and awarded temporary legal custody to the maternal grandparents. The juvenile court further ordered that Sidney's paternal grandparents be permitted to visit with Sidney one weekend per month.

In September 2006, Sidney's father was convicted of the three homicides and sentenced to death. On December 8, 2006, the maternal grandparents filed a petition to adopt Sidney in juvenile court. The petition was transferred to the Madison County Chancery Court where, on January 29, 2007, the paternal grandparents filed an intervening adoption petition. On May 6 and 7, 2008, the trial court held a hearing regarding both adoption petitions. The trial court stated that it would "engage in a comparative analysis of the competing parties in order to arrive at the best interest of the child" as though it were making "an initial custody determination between two parents."

On May 14, 2008, the trial court sent a signed letter to counsel granting the paternal grandparents' adoption petition and awarding the maternal grandparents visitation with Sidney. The trial court also directed that Sidney's transition from the maternal grandparents' home to that of the paternal grandparents take place between 11:00 a.m. and 2:00 p.m. on May 31, 2008.[1]

The trial court entered the final decree of adoption reflecting its ruling on June 16, 2008. The next day, the maternal grandparents filed a notice of appeal and a motion for stay pending appeal, which the trial court denied. The maternal grandparents filed in the Court of Appeals a motion for review of the trial court's order denying the motion for stay pending appeal, which the Court of Appeals denied.

The Court of Appeals held that the trial court erred in considering the paternal grandparents' petition because the paternal grandparents did not meet the physical custody

---

[1] In its letter to counsel, the trial court also terminated the parental rights of Sidney's father as requested by both sets of grandparents in their adoption petitions. In addition, Sidney's father had joined his parents in their petition to adopt Sidney for the stated purpose of "providing his consent to the adoption and . . . terminating his parental rights." Sidney's father has not appealed the termination of his parental rights.

requirement in Tennessee Code Annotated section 36-1-116(f)(1) (2005) and remanded the case to the trial court to enter an order granting the maternal grandparents' petition.

## II. Interpreting Tennessee Code Annotated Section 36-1-116(f)(1)

We granted the paternal grandparents' application for permission to appeal to determine whether a trial court may grant an intervening adoption petition pursuant to Tennessee Code Annotated section 36-1-116(f)(1) when the intervening petitioners do not have physical custody or the right to receive physical custody of the child sought to be adopted. Issues of statutory construction are questions of law, which we review de novo with no presumption of correctness afforded to the lower court's conclusions of law. Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 836 (Tenn. 2008).

Our role in construing statutes is to ascertain and give effect to the legislative intent without unduly restricting or expanding the statute's intended scope. Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995). To this end, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. In re C.K.G., 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. Eastman Chem. Co. v. Johnson, 151 S.W.3d 503, 507 (Tenn. 2004).

Section 36-1-116(f)(1) governs, among other things, a trial court's authority to grant an adoption petition. This section provides, in pertinent part:

> Upon the filing of the petition, the court shall have exclusive jurisdiction of all matters pertaining to the child . . . except for allegations of delinquency, unruliness or truancy of the child pursuant to title 37; provided, that, *unless a party has filed an intervening petition to an existing adoption petition concerning a child who is in the physical custody of the original petitioners*, the court shall have no jurisdiction to issue any orders granting custody or guardianship of the child to the petitioners or to the intervening petitioners or granting an adoption of the child to the petitioners or to the intervening petitioners unless the petition affirmatively states, and the court finds in its order, that the petitioners have physical custody of the child at the time of the filing of the petition, entry of the order of guardianship, or entry of the order of adoption, or unless the petitioners otherwise meet the requirements of § 36-1-111(d)(6) [validly executed surrender].

(Emphasis added).

Tennessee Code Annotated section 36-1-116(f)(1) generally prohibits a trial court from granting an adoption "unless the petition affirmatively states . . . that the petitioners have physical custody of the child at the time of the filing of the petition." By its plain language, however, the statute also includes an exception to the physical custody requirement when the petitioners "ha[ve] filed an intervening petition to an existing adoption petition concerning a child who is in the physical custody of the original petitioners." Tenn. Code Ann. § 36-1-116(f)(1); See Dawn Coppock, Coppock on Tennessee Adoption Law 80 (2005).

Although the language of section 36-1-116(f)(1) is clear and unambiguous, we are required to construe a statute "so that the component parts are consistent and reasonable." Cohen v. Cohen, 937 S.W.2d 823, 827 (Tenn. 1996). We must therefore address the maternal grandparents' argument that other provisions in the statutory scheme require us to depart from the plain language of section 36-1-116(f)(1).

We first note that the plain language of section 36-1-116(f)(1) is consistent with section 36-1-115(b), which governs standing to file an adoption petition. This section states that "petitioners must have physical custody or must demonstrate to the court that they have the right to receive custody of the child sought to be adopted as provided in [the statute governing a validly executed surrender] at the time the petition is filed, *unless they are filing an intervening petition seeking to adopt the child*." Tenn. Code Ann. § 36-1-115(b) (2005) (emphasis added). Thus, intervening petitioners are not required to have physical custody or the right to receive physical custody of the child sought to be adopted for purposes of filing their petition.

On the other hand, there are two adoption provisions that do not appear to contemplate an exception to the physical custody requirement. Section 36-1-116(b)(5), which governs the contents of an adoption petition, requires that the petition include a statement "[t]hat the petitioners have physical custody of the child or that they meet the requirements of [a validly executed surrender]." Likewise, section 36-1-120(a)(4), which governs the contents of a final order of adoption, requires that the final order include "[t]he date when the petitioners acquired physical custody of the child and from what person or agency or by which court order." Tenn. Code Ann. § 36-1-120(a)(4) (2005).

To conclude that these requirements apply to intervening petitioners would, however, render inoperative the exception to the physical custody requirement for those "filing an intervening petition seeking to adopt the child" in section 36-1-115(b). We have a duty "to construe a statute so that no part will be inoperative." Tidwell v. Collins, 522 S.W.2d 674,

676 (Tenn. 1975). We suspect, moreover, that the General Assembly simply did not deem it necessary to reiterate for purposes of these particular subsections that intervening petitioners are exempt from the physical custody requirement. We therefore conclude that the requirements of sections 36-1-116(b)(5) and -120(a)(4) do not apply when the petition was filed pursuant to the exception to the physical custody requirement for intervening petitioners in section 36-1-115(b).

For the reasons articulated above, we conclude that the trial court properly granted Sidney's paternal grandparents' adoption petition even though Sidney was in the physical custody of her maternal grandparents, the original petitioners, at the time the paternal grandparents filed their intervening adoption petition.[2]

## III. Comparative Fitness Analysis

One stated purpose of Tennessee's adoption statutes is to protect "[t]he rights of children to be raised in loving homes that are capable of providing proper care for adopted children and that the best interests of children in the adoptive process are protected." Tenn. Code Ann. § 36-1-101(a)(3) (2005). Although Tennessee's adoption statutes do not outline a specific procedure by which a trial court evaluates two competing adoption petitions, a comparative fitness analysis furthers the purpose of ensuring that a child is placed in the best possible home. Indeed, trial courts currently engage in a comparative fitness analysis to determine which parent is the more fit custodian. In re C.K.G., 173 S.W.3d at 732; Parker v. Parker, 986 S.W.2d 557, 562 (Tenn. 1999); see Tenn. Code Ann. § 36-6-106 (2005 & Supp. 2009).

In this case, the trial court permitted both sets of grandparents to present evidence regarding their fitness, their ability to provide for Sidney financially, and Sidney's best interests. See Tenn. Code Ann. § 36-1-120(a)(10), (11), (13). In granting the paternal grandparents' adoption petition, the trial court made specific findings of fact that are included in the final decree of adoption.[3] We presume that the trial court's findings of fact

---

[2] This determination pretermits the issue of whether the paternal grandparents met the requirements of section 36-1-116(f)(1) because Sidney's father joined in their adoption petition for the stated purpose of consenting to the adoption and thus surrendered Sidney to them.

[3] The final decree of adoption reflects the trial court's consideration of the factors included in section 36-6-106(a) for determining the best interests of a child, which apply to any "proceeding requiring the court to make a custody determination." Of those factors, the following are pertinent to this case:

> (1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(continued...)

are correct, and we will not disturb those findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d); Bogan v. Bogan, 60 S.W.3d 721, 727 (Tenn. 2001). "When issues of credibility and weight of testimony are involved, we afford considerable deference to the trial court's findings of fact." Larsen-Ball v. Ball, 301 S.W.3d 228, 235 (Tenn. 2010). We may infer the trial court's findings on issues of credibility and weight of testimony from the manner in which the trial court resolved conflicts in the testimony and decided the case. Interstate Mech. Contractors, Inc. v. McIntosh, 229 S.W.3d 674, 678 (Tenn. 2007).

Sidney was seven years old at the time of the hearing on the adoption petitions in May 2008. During the three years and four months that Sidney lived with her maternal grandparents, she visited her paternal grandparents one weekend per month. Continuity and "the length of time the child has lived in a stable, satisfactory environment" are important factors in determining the best interests of a child. Tenn. Code Ann. § 36-6-106(a)(3). In granting the paternal grandparents' adoption petition, however, the trial court implicitly found that other evidence introduced at the hearing outweighed this factor. We agree.

The trial court first found that the paternal grandparents were collectively younger than the maternal grandparents. Indeed, the paternal grandfather and grandmother were seventy-three and sixty-six respectively, and the maternal grandfather and grandmother were seventy-six and seventy-one respectively. The trial court also found that the paternal grandparents had "excellent parenting skills and experience in rearing children" of Sidney's age. In support of this finding, the trial court heard testimony that the paternal grandparents raised their own three children and seven foster children.

---

[3] (...continued)
(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;
(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . . ;
(4) The stability of the family unit of the parents or caregivers;
(5) The mental and physical health of the parents or caregivers;
(6) The home, school and community record of the child;
. . .
(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and
(10) Each parent or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

The trial court observed, moreover, that the paternal grandparents were "better able to assist [Sidney] educationally and [were] more involved in church and social activities" that would benefit Sidney. The evidence does not preponderate against this finding. The paternal grandparents lived three miles from the elementary school that Sidney would attend if they were permitted to adopt her. For the past forty-five years, they had served on committees, taught classes, and coached sports at their church. The paternal grandmother also worked in the church day care for twenty-three years. On the weekends that she was with her paternal grandparents, Sidney participated in a Sunday school class and attended services. Regarding "social activities," various witnesses described the paternal grandparents' involvement with the little league sports program operated by Jackson Parks and Recreation. For over forty years, the paternal grandfather coached little league baseball, during which time the paternal grandmother served as the league secretary.

The trial court also found that the paternal grandparents had "a closer relationship with their extended family and adult children and . . . a better support group available to assist them if necessary." In light of the extensive testimony from Sidney's paternal relatives concerning their ability and willingness to assist Sidney's paternal grandparents, we find that the evidence does not preponderate against this finding.

Although not a "controlling consideration," the trial court also found that the paternal grandparents had "more financial resources available to them." The evidence presented at trial indicates that both sets of grandparents were financially capable of providing for Sidney. The evidence does not preponderate against the trial court's finding, however, that the paternal grandparents were in a better position to provide for Sidney financially.

Finally, the trial court found that the paternal grandparents would be able to help Sidney deal with her mother's death "in a more positive fashion and that this [would] benefit [Sidney] in later years." The following evidence presented at the hearing supports this determination.

In his deposition, which was admitted into evidence, Sidney's father described his first telephone conversation with Sidney after his incarceration. During this conversation, he apologized to Sidney for killing her mother and told her that he was "out of [his] mind." The paternal grandparents testified that Sidney, who was six years old at the time, appeared excited to speak to her father and that, if permitted to adopt Sidney, they would allow her to communicate with her father if she so desired but only after consulting a therapist regarding how best to facilitate that relationship. When asked what she told Sidney about the events surrounding Sidney's mother's death, the paternal grandmother stated that she drove Sidney by the jail and explained that Sidney's father had to live there now as punishment and that jail was "kind of like in timeout when you've done something you shouldn't do."

The maternal grandmother testified that, before Sidney spoke to her father, she told Sidney only that her father could not continue living at home after Sidney's mother "had gone to heaven." Sidney later asked more questions and expressed fear that something "was going to happen" to her or to her maternal grandparents. In response, the maternal grandparents withheld visitation from the paternal grandparents.[4] The maternal grandmother also described to Sidney the events surrounding her mother's death. Specifically, the maternal grandmother told Sidney that her father shot her mother "in the head three times and then he went back and reshot her [for] a total of eleven times," that he had told several people that he was going to kill her mother, and that "they would put an i.v. in his arm like they did when you went to the hospital" to take his life for killing her mother. The maternal grandmother admitted that in Sidney's presence she had referred to Sidney's father as "evil" and said that she was angry with Sidney's paternal grandmother for letting Sidney speak to her father.

While the maternal grandparents' feelings of anger toward Sidney's father and grief over the loss of their daughter are understandable, we agree with the trial court that it is in Sidney's best interests "that this tragic event fade from her mind and that she be left only with the warm memories of her mother as can be provided by both sets of grandparents. She should not be burdened any more than necessary with the details of her mother's death and the surrounding events."

Having conducted a thorough review of the record, we find that the evidence does not preponderate against the trial court's findings that the paternal grandparents were fit, that they were capable of providing for Sidney financially, and that Sidney's best interests would be served by granting their petition. See Tenn. Code Ann. § 36-1-120(a)(10), (11), (13).

## IV. Visitation

The trial court granted the maternal grandparents visitation of not less than one weekend per month, special holiday visitation, and telephone contact once per week. The trial court stated that it considered the factors set forth in Tennessee Code Annotated section 36-6-307 (2005) for determining the best interests of the child.[5] We have reviewed the order

---

[4] On August 15, 2007, the paternal grandparents filed a petition for contempt and to modify visitation in response to the maternal grandparents' decision to withhold visitation. The trial court entered an order on November 20, 2007, awarding the paternal grandparents additional visitation, including special holiday visitation and telephone contact twice per week. This order also prohibited future contact, direct or indirect, between Sidney and her father.

[5] Tennessee Code Annotated § 36-6-307 sets out factors that the trial court is to consider when
(continued...)

of visitation under an abuse of discretion standard, <u>see</u> <u>Smallwood v. Mann</u>, 205 S.W.3d 358, 361 (Tenn. 2006), and agree with the trial court that it is in Sidney's best interests to maintain a relationship with her maternal grandparents through regular visitation. As the trial court noted, Sidney resided with her maternal grandparents for a lengthy period of time, she had a "close bond" with her maternal grandparents, and a cessation of that relationship "would pose a danger or risk of substantial harm to [Sidney] and/or likelihood of severe emotional harm."

## V. Conclusion

For the reasons articulated above, we affirm the trial court's grant of the paternal grandparents' adoption petition and the trial court's award of visitation to Sidney's maternal grandparents. We therefore reverse the judgment of the Court of Appeals and reinstate the judgment of the trial court in all respects. Costs of this appeal are assessed against the appellees, the maternal grandparents, for which execution may issue if necessary.

_____
JANICE M. HOLDER, CHIEF JUSTICE

---

[5] (...continued)
determining the best interests of the child for the purpose of awarding grandparent visitation. Those factors are as follows:

> (1) The length and quality of the prior relationship between the child and the grandparent and the role performed by the grandparent;
> (2) The existing emotional ties of the child to the grandparent;
> (3) The preference of the child if the child is determined to be of sufficient maturity to express a preference;
> (4) The effect of hostility between the grandparent and the parent of the child manifested before the child, and the willingness of the grandparent, except in case of abuse, to encourage a close relationship between the child and the parent or parents, or guardian or guardians of the child;
> (5) The good faith of the grandparent in filing the petition;
> (6) If the parents are divorced or separated, the time-sharing arrangement that exists between the parents with respect to the child; and
> (7) If one (1) parent is deceased or missing, the fact that the grandparents requesting visitation are the parents of the deceased or missing person.